IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 15, 2008

**STATE OF TENNESSEE v. ANTHONY L. WILLIAMS**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2004-C-1867      Seth Norman, Jr., Judge**

**No. M2007-01385-CCA-R3-CD - Filed March 5, 2009**

A jury convicted the Defendant, Anthony L. Williams, of first degree premeditated murder, felony aggravated assault, and felony reckless endangerment. The trial court ordered the Defendant to serve a life sentence for his first-degree murder conviction, a four-year sentence for his aggravated assault conviction, and a two-year sentence for his felony reckless endangerment conviction. The Defendant appeals, contending: (1) the evidence is insufficient to support his conviction for first degree premeditated murder; (2) the trial court erred by failing to instruct the jury on self-defense; and (3) the trial court erred by failing to instruct the jury on defense of others. After thoroughly reviewing the record and the relevant authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Michael A. Colavecchio, Nashville, Tennessee, for the Appellant, Anthony L. Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Clarence E. Lutz, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Deborah Housel, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I. Facts**

The homicide at issue in this appeal occurred on the evening of April 7, 2004, outside an apartment located at 300 Settle Court in Nashville. On that evening, a group of friends visited Precious Williams, the apartment's occupant. The group included: Williams's cousin, Anthony Boyce; Boyce's cousin, Marco Teasley; Peter Batiste; Henry Dodson; and the victim, George

Sutherland. According to Boyce, everyone gathered briefly on the porch and then entered the apartment to play a video game.

After dark, around 8:00 P.M., Boyce, Teasley, Batiste, and the victim stepped onto the porch "to get some fresh air." Soon, brothers Mario and Desmon Robinson, who appeared unarmed, approached the group. Boyce described the tension that soon arose: "Mario began to say something and I was like, [']what is you talking about['], you feel me[?] [A]nd my cousin was saying the same thing. [']Man, why you-all coming down here with that bull-[jive?']" As the argument began, the victim went back into the apartment, leaving Boyce, Batiste, and Teasley on the porch with the Robinson brothers. Within a matter of seconds, Batiste suddenly ran from the porch, and Boyce realized that the Defendant was approaching from behind the Robinson brothers while carrying a rifle in an "upward" position. Boyce immediately ran to a breezeway "two doors away" from the apartment.

As Boyce ran, he looked behind him and realized that Teasley remained on the porch and was fighting with the Robinson brothers. After he reached the breezeway, Boyce observed the Defendant standing a short distance from the porch with his gun aimed toward the apartment. The Defendant then fired multiple shots in rapid secession, while fire and smoke emerged from the rifle. Boyce testified that, having previously been shot with a shotgun, he would recognize the sound of a shotgun discharging and that the shots he heard were not from a shotgun. He insisted that the shots were "continual" and without a pause. Because Boyce could not see the apartment door from the breezeway, he did not know whom the Defendant had shot.

After the firing ceased, Boyce saw Williams and the Robinson brothers running from the apartment. The Defendant was slightly behind the brothers, which allowed Boyce to see that the Defendant still had the rifle. Boyce ran back to the porch, where he found the victim lying face-up, bleeding, in the doorway. The victim appeared to Boyce to be conscious, because he attempted to respond to Boyce's questions, but Boyce could not understand the victim's responses.

When police arrived, Boyce told them what he observed. He explained that he knew the Defendant by only his nickname, "AWOL." Two days later, on April 9, the police showed Boyce a series of photographs, and Boyce identified the Defendant's photograph as the person who fired the gun towards the apartment.

On cross-examination, Boyce testified that he had known the victim "all his life" and that the victim was "like a brother" to him. He said, "[W]hen we [were] young we used to run wild, but as we got older things began to get different. . . . [W]e began to start working, . . . we all had a family. But he was . . . away from what the crowd was. . . . [H]e . . . just lived a solid life . . . ."

Boyce testified the group visiting Williams was neither drinking nor using drugs the night of the shooting. He explained he did not tell the police Henry Dodson was present during the shooting because, although he knew Dodson, he never noticed him during the shooting. Boyce recalled that, because the Robinson brothers kept their hands in their jacket pockets, he believed and

2

later reported to police that the brothers were carrying guns when they arrived at the apartment.

Concerning the nature of the argument between the Robinsons and Teasley, Boyce elaborated only that it was not "a big argument, but . . . they had some beef with [the group] or something." He recalled that, after Batiste ran from the porch, he did not see Batiste again that night. Boyce testified that Teasley, who was unarmed, fought with the Robinson brothers while he hid. He explained that he did not hear shots fired for at least one minute and perhaps as many as five minutes after he took cover in the breezeway. Boyce explained that, after he attempted to communicate with the victim, he waited nearby until police arrived and questioned him.

Marco Teasley testified that he was present at the shooting. Teasley said that the Robinson brothers approached the group gathered on Williams's porch, and the Defendant arrived shortly thereafter, carrying a rifle. He explained that, although the Defendant's arrival prompted everyone else to flee, he remained on the porch because "[he] didn't want to run, [he] had to fight."

Teasley recounted how, after he and the Robinson brothers "[had] words" on the porch, Desmon Robinson hit Teasley in the mouth, knocking out a tooth, which was later collected by police. Teasley then took off his jacket and "grabbed one of them." While Teasley and the Robinsons fought, the Defendant stood at the end of a nearby fence, holding his rifle. At some point during the confrontation the Defendant pointed his rifle at Teasley and instructed Desmon Robinson to "'get out of the way.'" Teasley testified that he was scared and that he feared for his life when the Defendant pointed the rifle at him and told Desmon to get out of the way.

Teasley testified that, in order to shield himself from the rifle the Defendant aimed at him, he tried to "put [the Robinson brothers] in the middle." Teasley then tried to enter the apartment and, finding it locked, knocked on its door. Unable to enter the apartment, Teasley retreated to a nearby stairwell where the Robinson brothers pursued him. Shortly after retreating to the stairs, Teasley heard two sets of three shots each. Teasley identified the shots as semi-automatic weapon fire. He explained that the Robinson brothers fled after the first set of three shots was fired. Teasley recalled that, by the end of the fight, both his hand and his mouth were bleeding.

After the assailants fled, and people within the apartment came outside, Teasley emerged and found the victim "just laying on the ground," face-up, with his legs buckled underneath his body. Teasley believed that at least one child was inside the apartment during the shooting. The day of the shooting, Teasley gave police a statement about the shooting. Two days later, police showed Teasley a photo line-up, and Teasley identified the Defendant as the shooter.

On cross-examination, Teasley elaborated that he, the victim, Boyce, Batiste, and Dodson gathered on the porch before the confrontation began. Teasley and Dodson were discussing Teasley's lawnmower and music album. Teasley reiterated everyone fled once the Defendant arrived with a "black and short" gun, and he said the victim went inside the apartment when the confrontation began and that Dodson never injected himself into the fight. Teasley had known the Robinson brothers, who he thought were unarmed, for at least three years before the shooting. He

testified that, during the confrontation, the Defendant, with whom Teasley was also acquainted, stood about twelve feet from the porch and never approached the porch. Teasley estimated that the confrontation lasted about ten minutes. Teasley testified that he never saw the victim with a gun, either before or after the shooting. He explained that the steps under which he retreated were about six feet from the apartment door.

Teasley acknowledged that, when he spoke with the police the day of the shooting, he told them that he had not recognized the assailants. He admitted that this statement was untrue, but he explained that he denied knowledge of the assailants' identities "because it was the first day, [and] he] didn't know [what was] going to happen." Teasley had known the victim for at least nine years before the shooting. Teasley explained that, at trial, he was willing to truthfully testify not only because the victim had died but also because he was under subpoena. He said that, had the victim survived the shooting, he probably would have identified the assailants "if the victim wanted [him] to tell." On re-direct examination, the Teasley emphasized that, although he untruthfully denied recognizing the assailants, he gave an otherwise truthful and complete account of the shooting when he spoke with police the evening of the shooting.

Precious Williams testified she lived at the apartment involved in this shooting and gave the following account of the events leading up to the shooting: Williams testified she, the victim, Teasley, Rico Murry (Williams's boyfriend), "James" (Williams's friend), "Lacresha" (Williams's friend), and Jasmine (Williams's "little girl") convened at her apartment on April 7, 2004. As she and several of her visitors played a computer game inside her apartment, she heard a noise at her door, which she described as a "bump." Alarmed, she emerged from her apartment to find Teasley fighting with the Robinson brothers, each of whom she knew. She asked them "to stop fighting because it wasn't worth it." During the scuffle, which she estimated to have lasted between three and five minutes, Williams saw the Defendant waiving a rifle toward the scuffle while he stood on a brick a short distance down the sidewalk.

As Williams stood outside her apartment attempting to find cover, she heard her apartment's screen door slam as though someone had come outside, immediately after which she heard the sound of "more than ten" shots being fired. From where she stood, Williams could see neither who had exited her apartment nor, immediately, who had been shot. Williams never saw the Defendant fire his gun. Williams merely saw "[the Defendant] with the gun, fanning the gun, and [she] heard the gun go off and [she] ran." Williams ran back up the sidewalk to her apartment after she no longer heard gunfire. As she ran, Williams saw the three men run from her porch, and one of the assailants stopped briefly to pick up a gun lying on her porch.

When Williams reached her porch, she found the victim, who appeared to have been shot. She knocked on her apartment door, and Murray let her in, helped pull the victim's body inside the apartment, and called the police. Williams testified that she was hysterical, in shock, and crying while they waited for police to arrive. She confirmed that, when the police showed her a photo line-up, she identified the Defendant as the person who shot the victim.

On cross-examination, Williams emphasized that, when she heard a "bump" on her door, she

4

immediately went outside where she saw only Teasley and the three assailants. Williams described the Defendant's gun as "black, [with] a long clip in it, like . . . a banana clip . . . . [K]ind of long in the front" and said neither of the Robinsons appeared to have a gun. She explained that, after the gunfire began, she ran away from the Defendant. Williams returned only after the gunfire ceased. As Williams neared her porch, she did not see Teasley, but she did see a three-foot long shotgun lying on her porch. However, as she testified on direct, one of the assailants picked up the shotgun before he and the other assailants fled. She clarified that the victim was propped up against her door when she found him.

Rico Murray testified that he was present at this shooting, stating that he went to Williams's apartment after he got off work on April 7, 2004. He said he was friends with the victim, and he gave the following account of what he observed from inside Williams's apartment: Murray testified that, when he was playing a computer game inside the apartment, only a friend he identified as "Mr. Ensley" and Williams's daughter, Jasmine, were inside the apartment. He did not know whether the victim entered the apartment at any time that evening. While playing the game, Murray became aware that "a lot of confusion . . . was going on outside," and he soon heard a short series of rapidly fired shots, which he described as semi-automatic gunfire. Murray immediately dropped to the floor, and Mr. Ensley placed Jasmine between a couch and a wall and covered her with his body.

After the shots ceased, and Murray heard someone knocking on the door, Murray opened the door, which caused the victim's body to fall, face-up, backwards over the threshold and partially into the apartment. Murray called 911 after he saw that the victim was bleeding and appeared unable to move. Although Murray tried to keep the victim awake while waiting for the police, the victim's speech was unintelligible, and his eyes periodically rolled back into his head.

On cross-examination, Murray explained that, after he arrived at the apartment from work, he did not emerge from the apartment until after the shooting. He conceded that, because he was able to open the door without releasing the lock, the apartment door might not have been locked. Also, he clarified that the victim appeared to have been standing, with Williams's aid, against the door before he opened it. After police arrived, Murray left the apartment to survey the scene, and he did not see a shotgun.

Peter Batiste testified he was present at this shooting and gave the following account: Batiste testified that, while he spoke with the victim, and Teasley and Boyce chatted nearby, a group of three men approached the apartment. Batiste said that he recognized first two men as the Robinson brothers but that he did not recognize the man that lingered a short distance behind and carried a gun. Batiste emphasized that, although he knew the Defendant at the time of the shooting, he could not identify the armed man as the Defendant. As the Robinsons began to argue with Teasley, Batiste saw the victim enter the apartment.

Batiste recalled that, once the confrontation had become "a real big fist fight," the victim re-emerged from the apartment. He initially testified that the victim was not carrying a shotgun when he re-emerged and that he saw the shotgun lying on the ground very near the door only after the shooting. However, Batiste acknowledged he told a detective hired by the Defendant that he saw

5

the victim holding a shotgun but insisted he did not tell the investigator that the Defendant had fired the gun. Batiste then testified that the victim was armed with a shotgun when he emerged from the apartment.

Batiste further testified that, when the Robinsons and Teasley started to "throw punches," he and Boyce fled in the same direction. In later testimony, however, Batiste stated that he fled because the victim emerged with a shotgun. Batiste took cover in a nearby breezeway, where he soon heard a short round of gunfire. Batiste said that, after the shots ceased, he and Boyce returned to the porch, where Batiste saw the victim lying on the ground and the shotgun lying nearby.

On cross-examination, Batiste reiterated that he was familiar with the Defendant and expressed certainty that the armed man behind the Robinson brothers was not the Defendant. Batiste testified again that the victim carried a shotgun as he emerged from the apartment. However, he emphasized that the victim neither aimed nor fired the shotgun. Batiste acknowledged that he had prior convictions for selling a counterfeit controlled substance, selling a controlled substance, and aggravated assault.

Batiste did not recall whether he identified the Defendant as the armed man in the account of the shooting he gave the Defendant's private detective. Explaining why he may have said the Defendant was the armed man lingering behind the Robinsons, Batiste said, "I could have said something just to really throw them off because they [were] really harassing me," and explained, "I could have shot [the detective] anything to get [the detective] away from him."

Because Henry Dodson was unavailable to testify, his deposition was read into evidence. During the deposition, Dodson explained that he visited Williams's apartment the evening of the shooting to speak with Teasley about a music album Teasley had commissioned Dodson to produce. Dodson testified that he knew only Teasley, expressly denying that he knew any one else present at the shooting. Furthermore, Dodson stated that he would be unable to identify anyone present at the shooting besides Teasley because he was too frightened to pay attention to and note anyone's appearance.

According to Dodson, about two minutes after he arrived, two males approached the porch and asked Teasley, "'[W]hat's up man[?]'" whereupon Teasley instructed Dodson to "move back." After Dodson moved away a short distance, he observed one of the two assailants engage in a physical altercation with Teasley. When the pair had been fighting for about five minutes, Dodson observed one of the assailants draw a semi-automatic rifle from his coat, waive it around, and point it at Teasley. At about the same time, Dodson observed a man carrying a shotgun emerge from the apartment. Dodson explained that seeing the two armed men prompted him to flee. He took cover in a nearby breezeway, where he soon heard a series of rapidly fired shots, which he identified as semi-automatic gunfire. Although Dodson conceded he had never heard a shotgun blast, he insisted the shots he heard could not have been fired from a shotgun. Dodson also conceded that, because he was unable to see either the assailant or the victim from where he had taken cover, he did not actually see anyone fire a gun.

6

Metro Nashville Police Department Officer James Patterson testified that, while on patrol, he was dispatched to 300 Settle Court to respond to reports of a shooting. When he arrived, he found emergency personnel attending to the victim. Officer Patterson also found Williams inside the apartment and escorted her away from the apartment to prevent the trauma of the crime scene from interfering with her ability to clearly describe the shooting. On cross-examination, Officer Patterson explained that he arrived at the scene of the shooting fewer than three minutes after being dispatched and was one of the first officers to arrive.

Metro Nashville Police Department Officer William Kirby of the identification crime scene section testified that he secured the scene of the shooting. Officer Kirby confirmed that upon arriving he found shell casings as well as the victim's blood and clothing near the doorway. After the scene was photographed, Officer Kirby prepared a crime scene diagram. Officer Kirby confirmed that eight photographs the State introduced accurately portrayed 300 Settle Court as he found it the day of the shooting.

Referring to the crime scene diagram that he prepared, Officer Kirby indicated the areas in which he found shell casings, bullet fragments, and a gold tooth. He found one .223 shell casing approximately eight feet from the doorway; two .223 shell casings approximately five feet from the doorway; and a group of twelve .223 shell casings as well as five bullet fragments in "the bloodiest area" immediately outside the doorway.

On cross-examination, Officer Kirby explained that, when he arrived, paramedics had already removed the victim from the scene but that two patrol officers remained on the scene while he completed his documentation. He then confirmed that he limited his investigation to the portion of a nearby drainage ditch abutting the porch, the porch itself, the breezeway, and the floor of the apartment immediately inside the door. However, Officer Kirby testified that he would have noted the presence of any holes in any portion of the surrounding drainage ditch where the assailants allegedly stood. He also testified that, although he indicated in his report that the twelve shell casings lying immediately outside the doorway were manufactured by Remmington, he could not recall whether the three other shell casings lying slightly farther from the doorway were also manufactured by Remmington. Officer Kirby conceded that the shell casings found five and eight feet from the door could have been kicked off the porch by emergency personnel attending to the victim. Finally, he explained that he did not dust the shell casings for fingerprints because the heat generated when they were fired would have destroyed any print residue.

Metro Nashville Police Department Officer Michael L. Pyburn, a firearm and tool mark examiner, testified that he received and analyzed five discharged bullets or bullet fragments and fifteen discharged cartridge cases recovered from the shooting. Officer Pyburn concluded that all but one of the discharged bullets and bullet fragments were fired from the same unknown .223 caliber firearm. He explained that the fifth bullet fragment contained insufficient "identifying characteristics to convince [him] that it was discharged by the same firearm." Similarly, he concluded that all but one of the fifteen discharged cartridge cases were fired from the same unknown firearm. Officer Pyburn explained that, because the fifteenth cartridge case bore insufficient markings to analyze, he "ruled it inconclusive." He further explained that the cartridge's

lack of markings might be due to the shooter's having held the gun "limp-wristed or one[-]handed as [the shooter was] running away." However, Officer Pyburn emphasized that, because the fifteenth cartridge case was .223 caliber, it could have been fired from the same firearm that discharged the other fourteen cartridges. Officer Pyburn also received and analyzed three bullets or projectiles retrieved from the victim's body. He concluded that each of the three bullets was fired from the same unknown firearm.

Officer Pyburn testified that someone, especially someone familiar with firearms, within hearing distance would be able to differentiate between shotgun and rifle fire. He explained the difference between the two sounds:

> A shotgun is more of a boom. . . . [Y]ou don't have the loud auto crack like you do with a rifle. Because a rifle bullet is moving faster than the speed of sound, where a shotgun you got a bunch of little pellets and they are coming out, they are not moving at the speed of sound, so you don't have that real sharp crack sound like you would with a high velocity rifle.

Officer Pyburn also described the material that would be present at the scene of the shooting had a shotgun been fired:

> If it was a shot shell you would have the empty hull, which again, is just an empty cup. You would have an over powder wad, which is usually plastic or compressed cardboard, a cushioning wad, and what they call a shot cup or a shot collar, which is a piece of plastic that is designed to hold all the little pellets to keep them protected as it moves down the bore of the shotgun until it reaches the muzzle. Then the pellets continue on that velocity, the shot cup being much lighter drops off. That leaves your shot, all your pellets to continue down range and open up.

He clarified that the shotgun material would settle either down range or "within the target itself."

On cross-examination, Officer Pyburn testified that the smallest pellet a shotgun can discharge is known as "bird shot" and would be difficult to locate in a grassy area.

Michael L. Moss testified that he was a Metro Nashville Police Department homicide detective at the time of the shooting. Moss testified that on April 7, 2004, he was summoned to 300 Settle Court to investigate a shooting and that he was later assigned as lead investigator of the shooting. When Moss arrived at the scene at 9:30 p.m., some twenty minutes after he was dispatched, patrol officers had already taped off the crime scene, and emergency personnel had already removed the victim. Moss explained that, given the large amount of blood in and around the doorway, the victim probably had collapsed near the doorway. He confirmed that several photographs the State introduced accurately reflected the scene of the shooting. As to the evidence at the scene, Moss recalled that his team collected fifteen spent shell casings, each of which were .223 caliber, and five bullet fragments. He testified that he did not find any shotgun wadding and that there was no evidence of a shotgun blast at the crime scene.

8

Moss testified that he briefly interviewed Williams and Boyce at the scene and that neither divulged the Defendant's identity. The day after the shooting, both Williams and Teasley separately picked the Defendant out of a photo line-up as the shooter. On April 9, 2004, Boyce picked the Defendant out of a photo line-up as the person Boyce had seen with a gun. Williams, Teasley, and Boyce each indicated to Moss that they were familiar with the Defendant before the shooting. Moss explained that a witness, reluctant to identify a perpetrator in the presence of others, is usually more forthcoming in a private setting.

On cross-examination, Moss reiterated that, when he arrived at the scene, the victim had already been removed, and approximately twelve officers were present. He testified that none of the officers entered the taped-off crime scene area, explaining that, because he "[doesn't] allow anybody to be inside that area," the officers "[knew] better than that." Moss conceded, however, that emergency personnel and witnesses probably freely moved about the crime scene before officers taped it off. Although Moss reiterated that he would have noted the discovery of a shotgun at the scene, he disclosed that he "seem[ed] to remember a shotgun in a corner [of the apartment], but [he] couldn't say for sure."

Dr. Feng Li, an assistant medical examiner for the Davidson County and Metro Nashville Medical Examiner's Office, testified that he performed an autopsy on the victim's body. From the autopsy, he concluded that multiple gunshot wounds were the victim's cause of death. He elaborated that, of the victim's nine total gunshot wounds, whole bullets caused six wounds, bullet fragments caused two wounds, and a grazing bullet caused one wound. Dr. Li testified that, because the victim's wounds contained neither soot material nor "powder tattooing," the shooter must have been more than two-and-a-half feet away from the victim.

On cross-examination, Dr. Li said that he was unable to determine the wounds' sequence of infliction. Also, Dr. Li testified that he did not test the victim's hand for gunshot residue, because he was unsure whether the victim's body had been cleaned. He explained that, although soot material can be cleaned from the skin, powder tattooing is buried underneath the skin and cannot be cleaned off.

After considering the evidence, a jury convicted the Defendant of first-degree premeditated murder, aggravated assault, and felony reckless endangerment. The trial court sentenced the Defendant to life imprisonment plus six years.

## II. Analysis

### A. Motion for New Trial

The State contends this Court lacks jurisdiction because the Defendant's motion for new trial was untimely filed. We note the following relevant dates to determine this Court's jurisdiction over the Defendant's appeal. On March 29, 2006, the trial court entered a judgment of conviction and sentencing order against the Defendant for first-degree premeditated murder, aggravated assault, and

felony reckless endangerment. On May 4, 2006, the Defendant filed a motion for new trial, which he amended on April 4, 2007, challenging the sufficiency of the evidence underlying his conviction and the trial court's instructions to the jury. On May 11, 2007, the trial court conducted a hearing and denied the Defendant's request for a new trial. On June 7, 2007, the Defendant filed a notice of appeal of the trial court's denial of his motion for a new trial.

We agree with the State that the Defendant's motion for a new trial was filed outside the time prescribed by Tennessee Rule of Criminal Procedure 33(b). This rule provides that a party requesting a new trial must file his request within thirty days of the entry of the order of his sentence. Tenn. R. Crim. P. 33(b). The Defendant filed his motion for a new trial five days late. The trial court's jurisdiction to grant the Defendant a new trial expired thirty days after it entered his sentencing order. *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997); *State v. Stephens*, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007). The trial court also had no power to hear the Defendant's untimely motion for a new trial, and the order issued denying a new trial was a nullity. *Martin*, 940 S.W.2d at 569. Furthermore, the Defendant's failure to timely file a motion for a new trial prevents him from appealing any issue properly raised in a motion for a new trial, such as the propriety of jury instructions. *Stephens*, 264 S.W.3d at 728; Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). This Court has no authority to waive the Defendant's untimely filing of his motion for a new trial. *Stephens*, 264 S.W.3d at 728.

The Defendant's notice of appeal was untimely because the untimely motion for a new trial did not toll the thirty-day filing period for a notice of appeal. *See* Tenn. R. App. P. 4(c). The thirty-day period specified in Rule 4(a) of the Tennessee Rules of Appellate Procedure for filing a timely notice of appeal began to run on March 29, 2006, when the trial court entered the Defendant's sentencing order, and the period ended on April 27, 2006. Tenn. R. App. P. 4(a), (c). The Defendant filed his notice of appeal on June 7, 2007, almost fourteen months after the period expired.

Unlike the untimely filing of the Defendant's motion for a new trial, this Court does have authority to waive "in the interest of justice" the untimely filing of the Defendant's notice of appeal. Tenn. R. App. P. 4(a). Given the gravity of the crime as well as the magnitude of the punishment, we elect, in the interest of justice, to waive the timely filing of a notice of appeal.

As discussed above, the Defendant failed both to file a timely motion for new trial, which ordinarily waives appellate review. Tenn. R. App. P. 3(e). Also, the Defendant fails to request plain error review. Nevertheless, an appellate court may review an issue which would ordinarily be considered waived if the court finds plain error in the record. Rule 52 of the Tennessee Rules of Criminal Procedure states, "An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Tenn. R. Crim. P. 52(b). The Defendant relies partially on self-defense and defense of others in asserting the insufficiency of the evidence to support his first-degree murder conviction. The jury had a duty to find the Defendant not guilty if it found the Defendant acted in either self-defense or defense of

others when he killed the victim.  However, the trial court gave the jury neither a self-defense nor a defense of others instruction.  In an exercise of our discretion, we will review, for plain error, the merits of the trial court's refusal to instruct the jury on self-defense and defense of others.

### A. Failure to Instruct on Self-Defense and Defense of Others as Plain Error

In the Defendant's first issue on appeal, he argues that the trial court erred in ruling that he was not entitled to jury instructions on either self-defense or defense of others.  He asserts that the victim's re-emergence from the apartment with a shotgun would support a reasonable belief that force was immediately necessary to protect both the Defendant and the Robinson brothers and that, accordingly, the jury should have been instructed on the law of self-defense and defense of others.  The State contends that the Defendant waived this issue when he failed to file a timely motion for a new trial.

As discussed above, we review the trial court's refusal to instruct the jury on self-defense and defense of others for plain error.  Whether an issue rises to the level of plain error is a decision that lies within the sound discretion of the appellate court and may be considered to do substantial justice or to prevent needless litigation, injury to the interests of the public, prejudice to the judicial process, or manifest injustice.  *See* Tenn. R. App. P. 13(b); Tenn. R. Crim. P. 52(b); *State v. Adkisson*, 899 S.W.2d 626, 638-39 (Tenn. Crim. App. 1994).  In *Adkisson*, this Court stated that an appellate court must consider each of the following factors in determining whether an error constitutes "plain error": (1) the record must clearly establish what occurred at the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused must not have waive the issue for tactical reasons; and (5) consideration of the issue must be "necessary to do substantial justice."  *Adkisson*, 899 S.W.2d at 641-42 (citations omitted).  Our Supreme Court characterized the *Adkisson* test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error.  *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000).  Furthermore, complete consideration of all five factors is not necessary once it is clear from the record that at least one of the factors cannot be satisfied.  *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

The defense of self-defense is expressly provided for in Tennessee by statute and is defined, in relevant part, as follows:

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.  The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury.  The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds.  There is no duty to retreat before a person threatens or uses force.

T.C.A. § 39-11-611(a) (2003). Tennessee Code likewise provides for the defense of defense of person(s):

> A person is justified in threatening or using force against another to protect a third person, if:
>
> (1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and
>
> (2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

T.C.A. § 39-11-612 (2003).

A trial court has the duty to "give a complete charge of the law applicable to the facts of the case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986). This duty includes "giving jury instructions concerning fundamental issues ot the defense and essential to a fair trial . . . ." *State v. Anderson*, 958 S.W>2d 9, 17 (Tenn. Crim. App. 1998). *See also Myers v. State*, 206 S.W.2d 30, 32 (Tenn. 1947) (holding that a defendant is entitled to an affirmative instruction on self-defense if raised by the evidence). In deciding whether a defense instruction is warranted, the trial court "must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001).

The Defendant correctly asserts that, when evidence adequately supporting self-defense is admitted at trial, the question of whether an individual acted in self-defense is a factual question for the jury. *See State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). However, before a trial court may submit a defense question to a jury, the proof must fairly raise an issue as to the existence of that defense. T.C.A. § 39-11-203(c) (2006). The defendant has the burden of introducing this proof. T.C.A. § 39-11-203(c), Sentencing Commission Comments. Thus, this Court may find error only if a jury charge "fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

In this case, the trial court declined to instruct the jury on self-defense because it found that the evidence did not suggest that the Defendant feared the victim would harm anyone. The trial court explained that, although the victim may have emerged from the apartment with a shotgun, no evidence was presented that the victim either pointed it or threatened anyone with it:

> I don't have any proof whatsoever that the Defendant . . . was acting in defense of

12

anybody else. At best, all I have is the fact that the [victim] walked out the door with a shotgun. That's the best proof I have. I don't have any proof he ever raised it, he ever pointed it at anybody, I don't have anything. He walked out the door with a shotgun.

Therefore, the trial court found that the Defendant failed to present evidence that fairly raised an issue as to whether the Defendant acted in defense of either self or others when he killed the victim.

We conclude, as did the trial court, that, without evidence either that the victim used the shotgun in a manner causing the Defendant to believe that the victim presented an "imminent danger of death or serious bodily injury," the record contains no evidence that the Defendant's force was "immediately necessary to protect against" the victim. T.C.A. § 39-11-611(a). Thus, there is no basis for this Court to conclude that the evidence fairly raised an issue as to whether the Defendant acted in defense of either self or others. Accordingly, we conclude the trial court's refusal to instruct the jury on self-defense was not error.

Because the trial court did not err in refusing to instruct the jury on the requested defenses, it did not breach any clear and unequivocal rule of law, which a finding of plain error requires. *Adkisson*, 899 S.W.2d at 641-42. The trial court did not commit plain error when it failed to instruct the jury on the issue of self defense or defense of others.

## B. Sufficiency of the Evidence Supporting the Defendant's Murder Conviction

On appeal, the Defendant alleges that the evidence is insufficient to sustain his conviction for first degree premeditated murder. Particularly, he contends the evidence shows that the Defendant "was forced to open fire" on the victim because the victim re-emerged from the apartment carrying a shotgun. The State responds that the record contains abundant evidence to support the jury's finding that the Defendant premeditated the victim's killing and did not act either in self-defense or in defense of the Robinsons.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all

13

factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (*State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The "premeditated and intentional killing of another" is a form of first degree murder. T.C.A. § 39-13-202(a)(1) (2003). A killing is intentional where a defendant's "conscious objective or desire" is to cause death. T.C.A. § 39-11-106(a)(18) (2003). Furthermore, an intentional killing rises to the level of premeditation where a defendant exercises reflection and judgment before he kills. T.C.A. § 39-13-202(d) ("'Premeditation' means that the intent to kill must have been formed prior to the act itself."). However, the defendant's purpose to kill need not endure for any definite period of time. T.C.A. § 39-13-202(d).

The existence of premeditation is a question of fact for the jury to determine. Our Supreme Court has identified circumstances that, where established by the proof, may support a jury's finding of premeditation. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). The following factors "tend to support the existence" of premeditation: the use of a deadly weapon on an unarmed victim; the particular cruelty of the killing; declarations by the Defendant of an intent to kill; the procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id.*

The evidence, considered in the light most favorable to the State, proves that the Defendant, armed with a weapon, accompanied the Robinson brothers to the apartment at 300 Settle Court on April 7, 2004. While the Robinson brothers approached the porch and confronted the group gathered there, the Defendant remained a short distance behind the brothers, holding his rifle. As the confrontation escalated to a physical fight between the Robinson brothers and Teasley, the Defendant began to waive his rifle towards the porch, which a rational jury could interpret as an an intent to kill. At one point during the scuffle, which lasted as long as ten minutes, the Defendant pointed his rifle

14

toward Teasley and urged the Robinson brothers to "get out of the way." A reasonable jury could infer, as several of the witnesses did, that by uttering these words the Defendant declared his intent to kill. The Defendant's threat prompted Teasley to take cover in the breezeway, where the brothers pursued him. The victim then emerged from the apartment, possibly armed, and the Defendant opened fire on him, spraying at least six bullets into the victim's body. The victim died as a result of his gunshot wounds.

We conclude that the State's evidence is sufficient to support the jury's inference that the Defendant killed the victim with premeditation. Several minutes before he shot the victim, the Defendant, while pointing his rifle at Teasley, instructed the Robinson brothers to "get out of the way." However, because Teasley used the Robinson brothers to shield himself from the Defendant's line of fire, the Defendant did not open fire on Teasley. Instead, for five to ten minutes he lingered behind the Robinson brothers and pointed his rifle toward the porch while Teasley and the Robinson brothers continued to fight. A reasonable jury could infer from these words and from the Defendant's looming presence during the shooting that the Defendant intended to kill whoever posed a challenge to the Robinson brothers. Indeed, when the victim re-emerged from the apartment after the Robinson brothers followed Teasley under a stairwell, the Defendant, finally having a clear shot, immediately opened fire upon the victim. The period that passed between when the Defendant arrived and when he shot the victim is ample time for the Defendant to have reflected upon his objective of killing anyone who challenged the Robinson brothers. T.C.A. § 39-13-202(d). We conclude that the Defendant's words and actions before he opened fire on the victim were sufficient for a rational jury to conclude beyond a reasonable doubt that the Defendant both "formed the conscious objective" to kill and reflected upon this objective before he killed the victim. Accordingly, we conclude that the evidence was sufficient to support the conviction for first degree premeditated murder.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude that the record contains sufficient evidence to support the Defendant's convictions for first degree murder. Further, we conclude that the trial court correctly instructed the jury. Accordingly, we affirm the judgments of the trial court.

_____
ROBERT WEDEMEYER, JUDGE